**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| Robert L. Palmer and Phillip M. Kelly, as Chapter 7 Bankruptcy Trustee in the Matter of Robert L. Palmer and Tamara C. Palmer,<br><br>Plaintiffs,<br><br>v.<br><br>Union Pacific Railroad Co.,<br><br>Defendant. | Case No. 8:23-cv-252<br><br>**COMPLAINT<br>JURY TRIAL DEMANDED** |

Plaintiffs Robert L. Palmer ("Palmer") and Phillip M. Kelly, as Chapter 7 Bankruptcy Trustee on behalf of the bankruptcy estate of Robert L. Palmer[1] (the "Chapter 7 Bankruptcy Trustee," and collectively with Palmer, the "Plaintiffs"), file this Complaint against Defendant Union Pacific Railroad Co. ("Union Pacific" or "Defendant") for damages resulting from its violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as amended ("ADA").

**PRELIMINARY STATEMENT**

1.  Beginning in 2014, Union Pacific implemented company-wide changes to its fitness-for-duty program ("Fitness-for-Duty"). As a result of these changes, Union Pacific imposed a blanket requirement that employees in certain positions disclose specified health conditions—even where the condition had no impact on the employee's ability to safely perform his or her job. This requirement was needlessly invasive and violated the ADA by itself, but Union Pacific made matters worse by imposing a policy

---

[1] While Tamara C. Palmer was a party in the bankruptcy action, she is not a party in this case.

that automatically removes employees who disclose health conditions, or who Union Pacific suspects may have health conditions, from service. Union Pacific then subjects the employee to a Fitness-for-Duty evaluation, again regardless of whether the employee has been safely performing the essential functions of his or her job. These evaluations do not assess whether an employee is capable of performing the essential functions of his or her position, and Union Pacific does not conduct physical examinations of employees. Furthermore, Union Pacific routinely disregards the opinions of outside doctors who do conduct physical evaluations of the employees. Instead, Union Pacific demands medical information from the employee and conducts a "file review," regularly and arbitrarily concluding that the employee is unfit for duty because of a disability, and issuing unnecessary work restrictions it then refuses to accommodate.

2.    In February 2016, several Union Pacific employees commenced a class-action disability discrimination lawsuit against Union Pacific, alleging that Union Pacific's Fitness-for-Duty policies and practices constituted a pattern or practice of discrimination under the ADA. *See Quinton Harris et al. v. Union Pacific Railroad Co.*, Case No. 8:16-cv-381 (D. Neb.). The District of Nebraska certified the class in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision in March 2020.

3.    Palmer is a victim of the same discriminatory Fitness-for-Duty policies and practices alleged in *Harris*. Despite being qualified for and safely performing his job without incident, Palmer was removed from service for a Fitness-for-Duty evaluation under the new program and excluded from work at Union Pacific because of a disability. Palmer was a class member in *Harris*, and now timely brings this individual legal action.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. § 1331 because Union Pacific violated the ADA.

5. Venue is proper under 28 U.S.C. § 1391(b)(1) because Union Pacific is headquartered in Omaha, Nebraska.

6. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because Palmer worked in North Platte, Nebraska, unlawful employment practices were committed by Union Pacific in Omaha, Nebraska, because employment records relevant to Union Pacific's unlawful employment practices are maintained and administered in Omaha, Nebraska, and because Union Pacific's principal office is in Omaha, Nebraska.

## PALMER'S BANKRUPTCY

7. On March 5, 2019, Palmer, along with Tamara C. Palmer, filed for Chapter 7 bankruptcy protection in the U.S. Bankruptcy Court for the District of Nebraska, appearing as Case No. 4:19-BK-40333. The Chapter 7 Bankruptcy Trustee was thereafter appointed in Palmer's bankruptcy estate.

8. In June 2019, the U.S. Bankruptcy Court for the District of Nebraska entered a Discharge Order and the bankruptcy case was closed.

9. On March 16, 2023, Palmer filed his Motion to Reopen Chapter 7 Proceeding in the U.S. Bankruptcy Court for the District of Nebraska seeking to reopen his bankruptcy case to disclose and have administered his legal claims against Union Pacific.

10. On March 17, 2023, the U.S. Bankruptcy Court for the District of Nebraska entered an order granting the Motion to Reopen Chapter 7 Proceeding and, on April 4, 2023, reappointed Phillip M. Kelly as the Chapter 7 Bankruptcy Trustee to administer

certain assets of the bankruptcy estate, including the legal claims of Palmer against Union Pacific, as allowed for and required under 11 U.S.C. § 704(a).

11. On April 5, 2023, the Chapter 7 Bankruptcy Trustee filed a Notice of Intent to Claim Certain Assets, including the legal claims of Palmer against Union Pacific, to which Palmer filed a Resistance. Then, on May 1, 2023, the U.S. Bankruptcy Court for the District of Nebraska ordered resolution of this dispute deferred until resolution of Palmer's legal claims against Union Pacific.[2]

12. On May 24, 2023, the U.S. Bankruptcy Court for the District of Nebraska entered an Order approving the Chapter 7 Bankruptcy Trustee's employment of Nichols Kaster, PLLP, as special counsel for Palmer's bankruptcy estate to pursue the legal claims of Palmer against Union Pacific.

## THE PARTIES

13. Palmer resides in Brady, Nebraska. He was an employee of Union Pacific working in North Platte, Nebraska.

14. The Chapter 7 Bankruptcy Trustee conducts business principally in the Nebraska Panhandle.

15. Union Pacific is a railroad carrier engaged in interstate commerce and has operations in North Platte, Nebraska, and is headquartered in Omaha, Nebraska.

---

[2] Nothing in this Complaint shall be construed as a waiver or admission by Palmer that his legal claims against Union Pacific are not exempt from the bankruptcy estate.

## FACTUAL ALLEGATIONS

### *UNION PACIFIC'S FITNESS-FOR-DUTY POLICIES AND PRACTICES*

16. Union Pacific's Medical Rules, as reviewed and revised on February 1, 2014 (attached as Exhibit A), apply to all Union Pacific employees across the country. They outline the Fitness-for-Duty program at Union Pacific.

17. The Medical Rules require, among other things, that all employees in Telecom positions, Supply Department field positions, Operating Department field positions (including Transportation, Engineering Services and Mechanical positions), and Dispatcher positions disclose "any new diagnosis, recent events, and/or change in the following conditions"—which Union Pacific labels "Reportable Health Events." (Exhibit A). This includes, but is not limited to, a significant vision change in one or both eyes affecting visual acuity, as well as eye surgery or laser treatment of the cornea or retina.

18. Union Pacific's Fitness-for-Duty and "Reportable Health Events" policies are even broader in practice than the Medical Rules reflect. Union Pacific routinely triggers the Fitness-for-Duty process for employees who have never indicated they are unable to perform the essential functions of their jobs, simply because Union Pacific learns or suspects that the employee has, or has had in the past, a listed or non-listed health condition, or because a manager refers the employee for a Fitness-for-Duty evaluation based on a belief that an employee may have such a health condition.

19. Union Pacific also maintains other unlawful policies and qualification standards related to Fitness-for Duty that are not included within the Medical Rules. For example, Union Pacific uses a "1% rule" that disqualifies from service any employee who Union Pacific suspects or believes may be at more than a 1% risk of sudden incapacitation.

5

Union Pacific also requires employees to undergo exercise tolerance testing and then disqualifies from service any employee whose test results are not "normal," based on an indication that the employee may have a cardiac condition, however minor. On information and belief, Union Pacific maintains other, similar policies that it uses to screen out employees with disabilities for failing to meet a discriminatory qualification standard.

20. When a Fitness-for-Duty evaluation is triggered, the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

**Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

(Exhibit A.)

21. These Fitness-for-Duty evaluations are not individualized assessments of the employee's ability to safely perform the essential functions of the employee's job.

22. Union Pacific does not directly examine employees during Fitness-For-Duty evaluations.

23. Union Pacific routinely disregards the opinions of the employee's treating medical provider(s), and other medical providers who have physically examined the employee, and instead makes broad requests for medical information, including medical records, from the employee.

24. Once Union Pacific receives the medical information, Union Pacific's Health and Medical Services Department ("Health and Medical Services"), located in

6

Omaha, Nebraska, conducts a "file review" and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty.

25. Health and Medical Services routinely issues Fitness-for-Duty decisions that disqualify employees from their positions because of a disability, even though the disability does not affect the employee's ability to safely perform the essential functions of the employee's job (or other positions for which the employee may also be qualified).

26. Health and Medical Services also uses discriminatory qualification standards, tests, and/or other selection criteria to exclude individuals with disabilities from their positions.

27. When issuing Fitness-for-Duty determinations, Health and Medical Services relies on standardized protocols for employees with certain broad categories of health conditions or treatments, and it assigns standardized work restrictions to employees.

28. For example, as part of these standardized protocols, Health and Medical Services regularly relied on the Federal Motor Carrier Safety Administration ("FMCSA") 2014 Medical Examiner's Handbook ("the Handbook"), which the company downloaded from the FMCSA website, to determine which health conditions required work restrictions, which standard restrictions to impose, and how long restrictions should remain in place.

29. Union Pacific's then-Chief Medical Officer Doctor John Holland described the 2014 Medical Examiner's Handbook as "one of the sources we think is the best."

30. The recommendations contained in the 2014 Medical Examiner's Handbook, however, did not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners intended for use in medical certification of drivers operating a commercial vehicle in interstate commerce.

31. In addition, by December 2014, the FMCSA withdrew the 2014 Medical Examiner's Handbook from its website and no longer endorsed it for use for commercial driver certifications. Upon information and belief, the FMCSA never again endorsed the 2014 Medical Examiner's Handbook once it was removed from the website.

32. By at least 2015, Dr. Holland and Union Pacific learned that the FMCSA removed the Handbook from its website and no longer endorsed its use.

33. Despite this, Union Pacific continued to rely on the outdated Handbook as a basis to assign standardized work restrictions for its employees, including workers who are not subject to FMCSA medical certification requirements.

34. Union Pacific also represented to Courts, including in the *Harris* action, that the 2014 Medical Examiner's Handbook was reliable guidance and supported its decisions to impose standardized work restrictions on its employees. For example:

   a. "Union Pacific concluded that the 1% level of acceptable risk for sudden incapacitation is consistent with the acceptable risk threshold recommended by the FMCSA Medical Review Board and the 2014 version of the online FMCSA Medical Examiner Handbook[.]" Def.'s Br. in Opp'n to Pl.'s Mot. for Class Certification at 21, *Harris v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 259 (internal quotations omitted).

   b. "In 2014 the FMCSA issued Medical Examiner Handbook (FMCSA 2014) to provide medical examiners guidance for making medical fitness-for-duty recommendations for multiple health conditions that can impair the safety for commercial vehicle drivers. These and other recent FMCSA guidance documents, have served [] as reference materials and a general model for developing the Medical Fitness-for-duty Guidelines presented here." Dr. Holland Rebuttal Expert Report, May 11, 2018, *Harris v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 249-16.

   c. "Since 2014, Union Pacific has relied on the FMSCA's guidelines, as reflected in its Medical Examiner Handbook, in determining whether employees with epilepsy, a single unprovoked seizure, or other seizure risks who work in safety sensitive positions have an unacceptably high seizure risk such that it is appropriate to impose work restrictions." Decl. of Dr. John Holland dated Oct. 2, 2018 at 6, *Harris v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 261-71.

35. Through its Fitness-For-Duty program, Union Pacific removes employees from service based on medical conditions it learns or believes an employee may have or may have had in the past, whether or not such conditions actually interfere with the employee's ability to perform the essential functions of their position, and without making a good-faith effort to determine whether a reasonable accommodation exists.

36. As a result of the conduct described above, Union Pacific employees who have never had a problem performing the essential functions of their jobs have been forced to disclose sensitive medical information, stay off work without pay, and many have lost their livelihoods.

## *PLAINTIFF ROBERT PALMER*

37. Palmer was hired by Union Pacific on March 23, 1998, as a Switchman/Brakeman.

38. Most recently, Palmer worked for Union Pacific as a Trainman/Conductor based in North Platte, Nebraska. Over his fifteen-year career with Union Pacific, Palmer worked ably and safely in and around moving trains.

39. Palmer has had diabetes since childhood, a condition he disclosed to Union Pacific when he was hired in 1998. While working for Union Pacific, Palmer developed diabetic retinopathy, an eye condition that is a complication of diabetes.

40. In or around September 2011, Palmer experienced blurred vision in his right eye resulting from his diabetic retinopathy which required surgical treatment to correct. The procedure was successful, and Palmer returned to work.

41. In or around November 2013, while working as a Brakeman, Palmer experienced blurred vision in his left eye. Palmer told the Conductor with whom he was

working about his blurred vision, and the Conductor reported it to Palmer's manager, David Essman. Upon information and belief, Essman referred Palmer for a Fitness-for-Duty examination.

42. On or about November 11, 2013, Union Pacific removed Palmer from work pending the Fitness-for-Duty determination.

43. Palmer did not require surgical treatment of his left eye in November 2013. Instead, he began a course of treatment that required regular injections in his left eye once every month to two months to manage his diabetic retinopathy. Union Pacific was aware of Palmer's need to receive these injections.

44. Palmer's vision was also regularly checked during these monthly or bimonthly appointments.

45. Despite being qualified for his position and capable of performing its essential functions with or without reasonable accommodation, Union Pacific refused to return Palmer to work as a Conductor. Instead, in or around February 2014, Union Pacific's Chief Medical Officer, Dr. Holland, imposed standardized permanent work restrictions on Palmer because of his diabetic retinopathy that disqualified him from continuing to work as a Conductor or Train Crew member.

46. The permanent restrictions Dr. Holland imposed on Palmer prohibited him from: (1) operating company vehicles, on-track or mobile equipment, and forklifts; (2) working on or near moving trains, freight cars, or locomotives; (3) operating cranes, hoists, or machinery; and (4) working at unprotected heights over four feet above the work surface.

47. At no time during the Fitness-for-Duty process, or after, did Dr. Holland, or any doctor affiliated with Union Pacific, physically examine Palmer.

48. Upon information and belief, Dr. Holland is not an ophthalmologist, optometrist, or endocrinologist, nor is he Board certified in ophthalmology, optometry, or endocrinology.

49. Upon information and belief, at no time during the Fitness-for-Duty process, or after, did Dr. Holland or any doctor affiliated with Union Pacific speak with any of Palmer's treating medical providers.

50. After Dr. Holland imposed standardized, permanent work restrictions on Palmer, Union Pacific then refused to accommodate Palmer without ever engaging in an interactive process with him to identify whether a reasonable accommodation existed.

51. After being informed of his permanent work restrictions, Palmer attempted to get his job back. Palmer submitted a letter from his treating physician, Dr. David Pan, dated May 5, 2014, clearing him to return to work and stating that his "vision is good and [he] is able to work."

52. Palmer also asked to bid on other positions according to his seniority that could accommodate the restrictions Union Pacific imposed, including office jobs and, specifically, the positions of Dispatcher and Yardmaster. Union Pacific refused to return Palmer to work as a Conductor or Train Crew member and refused to transfer him to another position.

53. In a memorandum dated December 29, 2014, Dr. Holland also refused to reconsider Palmer's restrictions. In that memorandum, Dr. Holland confirmed that Palmer was given permanent work restrictions because of his diabetic retinopathy. Dr. Holland also stated that he would not consider any additional information from Palmer's treating physicians regarding the stability or prognosis of his eye condition.

54. In or around April 2016, Palmer again requested that Union Pacific reconsider its decision to impose permanent work restrictions on him.

55. In a letter dated April 22, 2016, Dr. Holland informed Palmer that Union Pacific would not reconsider his work restrictions either then or in the future, regardless of any information Palmer might provide about the "improvement or stability of [his] eye conditions."

56. Paradoxically, while acknowledging that Palmer met the Federal Railroad Administration's visual acuity standard for Conductors, Dr. Holland wrote that he believed it was "probable" that Palmer's "advanced diabetic eye disease has caused significant and permanent impairment in other aspects of your visual function including visual field losses . . . impaired color vision, and other decrements in visual quality." Additionally, Dr. Holland stated that he believed it was "likely" that Palmer would "develop worsening of visual function over time."

57. Dr. Holland concluded his April 2016 letter by reaffirming that the decision to permanently restrict Palmer from working as a Conductor or Train Crew member was made because of his "diabetic eye disease."

58. In a letter dated April 28, 2016, and signed by Terry Owens, Union Pacific's Director of Disability Management, Union Pacific informed Palmer that his "supervising department has been unable to identify a reasonable accommodation that will permit you to safely return to work in your assigned position." At no time before or after this determination was made, however, did Union Pacific engage in an interactive process with Palmer to identify whether a reasonable accommodation existed.

59. As a result of the onerous restrictions Union Pacific imposed, as well as its refusal to reconsider or lift those restrictions, Palmer concluded that it would be futile to continue to seek accommodations from Union Pacific to return to his position or to any other position with the Railroad.

60. In the time since it imposed permanent work restrictions on Palmer, Union Pacific has persisted in its refusal to allow Palmer to return to work as a Conductor or in any other position.

61. When Union Pacific refused to allow Palmer to return to work in his position or in any other position, he attempted to mitigate his losses through other employment. Among other jobs, Palmer has worked as a delivery truck driver and at a lumber yard, earning less than he did while employed by Union Pacific.

62. Palmer's vision has not worsened over time, as Dr. Holland predicted. Palmer did eventually undergo surgical treatment on his left eye, as he did in 2011 for his right eye. The surgery has enabled him to stop receiving regular injections in his left eye.

63. Today, Palmer requires no ongoing injections to manage his diabetic retinopathy. Palmer has also made changes to the ways in which he monitors and cares for his underlying diabetes.

64. Palmer remains capable of working in his former position as a Conductor or Train Crew member to this day.

65. On February 19, 2016, counsel for Palmer, on behalf of six named plaintiffs and those similarly situated, filed a First Amended Complaint against Union Pacific in the Western District of Washington, alleging disability discrimination in violation of the ADA,

along with state law. The case was thereafter transferred to the District of Nebraska. *See Harris v. Union Pacific Railroad Co.*, Case No. 8:16-cv-381 (D. Neb.).

66. Because he was a class member in *Harris*, Palmer's disability-discrimination claims have been tolled during the pendency of the class action, pursuant to *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

67. This Court certified the *Harris* class action in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision on March 24, 2020.

68. As a result of *Crown, Cork* tolling, Palmer had three hundred (300) days from the date of the Eighth Circuit's order to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Shortly after the Eighth Circuit issued its order reversing class certification, the parties entered into a tolling agreement, extending the statute of limitations for Palmer's and other class members' claims by an additional sixty (60) days. Palmer timely filed a charge of discrimination with the EEOC on April 24, 2020. On June 5, 2023, the EEOC issued Palmer a right-to-sue letter. Plaintiffs now timely initiate the present lawsuit.

## **CAUSES OF ACTION**

### **COUNT I**

#### ***VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(a)***
#### ***DISABILITY DISCRIMINATION—DISPARATE TREATMENT***

69. Palmer incorporates the foregoing paragraphs by reference.

70. The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

71. At all relevant times, Palmer was an individual with a disability as defined by the ADA.

72. At all relevant times, Palmer had the requisite skill, experience, education, and other job-related requirements of his position, could perform the essential functions of his position with or without reasonable accommodations, and was therefore a qualified individual under the ADA.

73. Section 12112(a) of the ADA prohibits employers from discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

74. Union Pacific discriminated against Palmer on the basis of disability by, among other things, imposing permanent work restrictions disqualifying him from his position because of a disability.

75. Because Union Pacific violated 42 U.S.C. § 12112, Palmer has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Plaintiffs are also entitled to attorneys' fees and costs incurred in connection with these claims.

76. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Palmer and others similarly situated. As a result, Plaintiffs are entitled to punitive damages.

## COUNT II

### VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(b)(6)
### DISABILITY DISCRIMINATION—DISPARATE TREATMENT

77. Palmer incorporates the foregoing paragraphs by reference.

78. "'[D]iscriminat[ing] against a qualified individual on the basis of disability' includes . . . using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, . . . is shown to be job-related for the position in question and is consistent with business necessity[.]" 42 U.S.C. § 12112(b)(6).

79. Union Pacific discriminated against Palmer on the basis of disability by using facially discriminatory qualification standards, employment tests, and/or other selection criteria, as part of its Fitness-For-Duty program and related policies, that are intended to screen out individuals with disabilities, and which did screen out Palmer.

80. Union Pacific's qualification standards are neither job-related nor consistent with business necessity.

81. Because Union Pacific violated 42 U.S.C. § 12112, Palmer has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Plaintiffs are also entitled to attorneys' fees and costs incurred in connection with these claims.

82. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Palmer and others similarly situated. As a result, Plaintiffs are entitled to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs pray for judgment against Union Pacific as follows:**

1. That the practices of Union Pacific complained of herein be determined and adjudged to constitute violations of the ADA;

2. An injunction against Union Pacific and its directors, officers, owners, agents, successors, employees, and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

3. For an award of damages arising from loss of past and future income, emotional distress, and other compensatory damages in excess of $75,000.00;

4. Pre-judgment interest, as provided by law;

5. For Plaintiffs' costs, disbursements, and attorneys' fees pursuant to law;

6. For an award of punitive damages;

7. For all relief available under the ADA;

8. For such other and further relief available by statute; and

9. For such other and further relief as the Court deems just and equitable.

Date: June 8, 2023

**NICHOLS KASTER, PLLP**

s/ *Jacob C. Harksen*
James H. Kaster* (MN # 53946)
    kaster@nka.com
Lucas J. Kaster* (MN # 396251)
    lkaster@nka.com
Jacob C. Harksen* (MN # 0400097)
    jharksen@nka.com
80 South Eighth Street
4700 IDS Center
Minneapolis, Minnesota 55402-2242
Telephone: (612) 256-3200
Fax: (612) 338-4878

* *Admitted in D. Neb.*

**ATTORNEYS FOR PLAINTIFFS**